Benjamin Galdston (CA Bar No. 211114)
**BERGER MONTAGUE PC**
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Tel: (619) 489-0300
bgaldston@bm.net

**TYCKO & ZAVAREEI LLP**
Annick Persinger (SBN 272996)
1970 Broadway – Suite 1070
Oakland, CA 94612
Tel: (510) 254-6808
Fax: (202) 973-0950
apersinger@tzlegal.com

*Attorneys for Plaintiffs*
*(Additional Counsel on Signature Page)*

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARIA QUEZADA and JOHN M. RODRIGUEZ, individually and on behalf of all others similarly situated,** | **'19 CV 2153 LAB BGS** |
| **Plaintiff,** | **CLASS ACTION COMPLAINT** |
| **v.** | **Violations of Cal. Unfair Competition Law** |
| **FRANKLIN MADISON GROUP, LLC (formerly known as Affinion Benefits Group, LLC).** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION .............................................................................................................. 1

THE PARTIES .................................................................................................................. 4

   A.   Plaintiff ................................................................................................................... 4

   B.   Defendant ............................................................................................................... 5

JURISDICTION AND VENUE ......................................................................................... 5

DEFENDANT'S VIOLATIONS OF CALIFORNIA LAW ............................................... 6

   A.   Affinion's Undisclosed Marketing Arrangements and 60% Commission ........................ 6

   B.   Affinion Induced Consumers to Purchase AD&D Insurance it Sponsored by Withholding Material Pricing Information ......................................................... 9

   C.   Defendant's Omissions and Half-Truths ................................................................ 14

   D.   Plaintiffs Relied on Defendant's Half-Truths and Omissions ................................. 16

CLASS ALLEGATIONS .................................................................................................. 16

   A.   Numerosity .......................................................................................................... 17

   B.   Commonality ....................................................................................................... 17

   C.   Typicality ............................................................................................................ 18

   D.   Adequacy ............................................................................................................ 18

   E.   Predominance and Superiority ............................................................................. 19

CLAIMS FOR RELIEF ................................................................................................... 20

   COUNT ONE  Violation of California's Unfair Competition Law California Business &Professions Code §§ 17200 et seq.  Fraudulent Business Practices ..................................... 20

   COUNT TWO  Violation of California's Unfair Competition Law California Business &Professions Code §§ 17200 et seq.  Unfair Business Practices ........................................... 22

PRAYER FOR RELIEF ................................................................................................... 23

JURY DEMAND .............................................................................................................. 23

---

**CLASS ACTION COMPLAINT**

Plaintiffs, Maria Quezada and John M. Rodriguez ("Plaintiffs"), bring this class action on behalf of themselves and all others similarly situated against Franklin Madison Group, LLC (formerly known as Affinion Benefits Group, LLC) ("Affinion")[1] and, based on personal knowledge, investigation of counsel and information and belief, allege as follows:

**INTRODUCTION**

1.      This is a proposed class action on behalf of Plaintiffs and other California consumers who (a) held accounts with financial institutions that sponsored group Accidental Death & Dismemberment Insurance ("AD&D Insurance") offered by Affinion, (b) purchased group AD&D Insurance from Affinion that was underwritten by various insurance companies that affiliated with Affinion, and (c) made at least one payment for the purchased group AD&D Insurance from their bank or credit union account (the "Class" as defined herein at paragraph 92).

2.      Group insurance is typically sold at discounted rates (compared to rates available to individuals) because the group typically uses the collective buying power of its large membership to secure the broadest coverage available at the lowest premium. But this norm of expected insurance economics is not present when it comes to the sale of Affinion's group AD&D product. Quite the opposite.

3.      Instead, Affinion utilized a marketing scheme to deceive consumers to believe these AD&D policies were competitively priced when, in truth, the policies are priced higher than comparative policies otherwise available in the marketplace. In fact, Affinion's AD&D policies are even more costly than group insurance underwritten by the same insurance companies that partner with Affinion but which Affinion does not sponsor.  As a result, Affinion has amassed staggering, ill-gotten profits over the years.

4.      In the guise of offering purportedly worthwhile, but discounted group insurance protection, Defendant induced Plaintiffs and others to purchase Affinion sponsored AD&D Insurance by withholding material pricing (and other) information.

---

[1] Any reference herein to Defendant includes its subsidiaries, affiliates, assigns, successors and predecessors-in-interest.

5.     Defendant unlawfully withheld material information regarding the pricing of the Affinion sponsored insurance by failing to disclose to Plaintiffs and other similarly situated California consumers that the group rates they were charged included a significant, undisclosed mark-up unrelated to the insurers' costs of providing this insurance that went into Affinion's pockets. *Specifically, the monthly premiums which consumers paid for Defendant's AD&D group insurance product were inflated by an approximate 60% commission that was paid to Affinion.*

6.     Affinion's business model for purveying group AD&D Insurance is as shrewdly simple as it is profitable, deceptive and unfair.

7.     Affinion advertises itself to financial institutions as being able to increase their revenues by building customer loyalty through "add-on" insurance programs which Affinion offers to provide to the institutions' customers through a written solicitation under the name of the institutions, but at no-cost to the institutions themselves. Affinion also promises the financial institutions they will receive compensation based on Affinion's product sales when they become an Affinion marketing client. In exchange, the financial institutions need only give Affinion access to their customers' contact and account information (in order for Affinion to offer the insurance to the institutions' customers and to collect the required premiums).

8.     Affinion then parlays these marketing arrangements with its financial institution clients to receive a supra-competitive commission from those insurance companies that are willing to allow Affinion to sponsor their AD&D Insurance.  With marketing agreements in place between Affinion, its financial institution clients and its insurance suppliers, each is poised to handsomely profit from the sale of the inflated group insurance, to the consumers' detriment.

9.     Unlike typical marketing arrangements where the beneficiary of the marketing itself pays a direct fee to the service provider, counterintuitively, the end consumer here, financial institution customers who purchase the AD&D Insurance, finance the cost of this loyalty "add-on" insurance program through an exorbitant undisclosed commission that is levied on the product price they pay (and then is kicked back to both Affinion and the sponsoring financial institution). Worse, Affinion misleads the financial institutions' customers (through its standard solicitation letters co-signed by the financial institutions and Affinion) into believing that the

amount they pay for this specially offered group insurance is affordably priced in comparison to similar insurance they could otherwise buy for themselves (including even from these same insurers).

10.    Defendant's uniform solicitations, marketing and sales materials violate California's Unfair Business Practices Act, Cal Bus. & Prof. Code § 17200, *et seq.* (the "UCL"), because they contain half-truths and omitted information that a reasonable consumer would want to know before purchasing the group AD&D Insurance.

11.    These uniform solicitations and marketing materials omit information that Affinion (as the marketer of this insurance on behalf of the financial institutions and the insurers) have a duty to disclose, and thus violate the fraudulent and unfair prongs of the UCL.

12.    Defendant had a duty to disclose, *but did not disclose* to Plaintiffs and others like them that: (1) The premiums for the Affinion sponsored, group AD&D Insurance included a mark-up for the payment of an approximate 60% commission to Affinion from the gross premium payment (which premium greatly exceeded the cost of providing such insurance); (2) Affinion, the insurers and the financial institutions are the actual, intended beneficiaries of Affinion's marketing services (and not Plaintiffs and other consumers like them); (3) Affinion paid the financial institutions for their customer lists and contact information so Affinion could garner its exorbitant fee from the insurers by providing them with access to Plaintiffs and the Class through such lists and information; and (4) the Affinion sponsored group AD&D Insurance was more expensive than comparable group AD&D Insurance (even as otherwise sold by these same insurers) because Affinion received an unconscionably high percentage of the premium as payment for acting as the middleman between the insurers and the financial institutions.

13.    California law requires Defendant, who having chosen "to speak the truth" about products or services to consumers, likewise disclose the whole truth and refrain from "untrue or misleading advertising" or other "fraudulent business practice or act" when marketing products or services to those consumers. Defendant, having made representations regarding the affordability of the Affinion sponsored AD&D Insurance and its purportedly competitive group rates had a duty to disclose all material facts within its knowledge regarding the Affinion

sponsored AD&D Insurance that Plaintiffs and other California consumers could not ascertain independently. Affinion did not fully disclose all material facts, including the material fact that the premiums included a substantial markup unrelated to the cost of providing such insurance.

14.    Had Plaintiffs known that the rates Defendant charged were not reasonable with respect to the risk insured because they included a significant mark-up to pay Affinion approximately 60% of the gross premium for its marketing services, Plaintiffs would not have purchased the Affinion sponsored AD&D Insurance.

15.    Defendant's fraudulent and unfair marketing and sale of group AD&D Insurance product caused Plaintiffs and the Class to suffer financial injury. Plaintiffs bring this suit on behalf of themselves and the Class and seek restitution for the inflated premiums they paid to Defendant, injunctive relief, and all other remedies as the Court deems appropriate.

<b><u>THE PARTIES</u></b>

**A.    <u>Plaintiff</u>**

16.    Plaintiff Maria Quezada is natural person who at all times relevant to this Complaint resided in this District.[2] She is an accountholder at Citibank, which was a contract client of Affinion.

17.    Plaintiff John Rodriguez is natural person who at all relevant times resided in Hemet, California.[3] At all relevant times, Mr. Rodriguez was a customer and accountholder of the San Diego County Credit Union, which was a contract client of Affinion.

18.    Defendant's half-truths and omissions prevented Plaintiffs from discovering that the quoted rates for the Affinion sponsored group AD&D Insurance contained an embedded, hidden mark-up to pay Affinion a commission of approximately 60% of the premium that was not related to the insurers' costs of providing this insurance.

---

[2] Plaintiff Maria Quezada currently resides in Fallbrook, CA. She previously lived in Vista, CA at all other times relevant to this Complaint.
[3] Plaintiff Rodriguez currently resides in Sun City, CA.

19. Ms. Quezada did not discover and could not have been aware despite the exercise of reasonable diligence, until May 17, 2019 that Defendant omitted material information regarding the premiums which Defendant had a duty to disclose.

20. Mr. Rodriguez did not discover and could not have been aware despite the exercise of reasonable diligence, until May 29, 2018 that Defendant omitted material information regarding the premiums which Defendant had a duty to disclose.

21. Prior to the dates set forth in the two preceding paragraphs, Plaintiffs believed that they had paid favorable group rates for their Affinion sponsored AD&D Insurance. They did not know before that date, nor could they have determined at an earlier date through the exercise of reasonable diligence, that the rates they paid included an undisclosed mark-up to cover the cost of the approximate 60% commission for Affinion's marketing services and that the rates they paid were more expensive than comparable group rates.

22. Once they learned that they had paid fraudulent and unfair rates for this AD&D Insurance, Plaintiffs acted with diligence to bring claims against Defendant on their own behalf and on behalf of the Class.

**B.    Defendant**

23. Defendant Franklin Madison Group, LLC (formerly known as Affinion Benefits Group, LLC)[4] is a Delaware limited liability company headquartered in Franklin, Tennessee. Mill Point Capital, a private equity firm, purchased Affinion Benefits Group, LLC from Affinion Group, LLC for $550,000,000 on August 15, 2018.[5]

**JURISDICTION AND VENUE**

24. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one member of the proposed Class is of diverse citizenship from Defendant; there are more than 100 Class members; and the aggregate

---

[4] Affinion Benefits Group, LLC changed its name to Franklin Madison Group, LLC as of September 17, 2018. *Affinion Insurance Solutions Announces New Company Name: Franklin Madison*, November 6, 2018, available at https://www.nafcu.org/newsroom/affinion-insurance-solutions-announces-new-company-name-franklin-madison.

[5] Affinion Group Holdings, Inc., Form 8-k, July 3, 2018, available at https://www.sec.gov/Archives/edgar/data/1404624/000119312518212262/d855380d8k.htm.

amount in controversy exceeds $5 million, exclusive of interest and costs. This Court also has jurisdiction under 28 U.S.C. § 1367 (supplemental jurisdiction).

25.     This Court has personal jurisdiction over Defendant because it conducts substantial business in California. Defendant conducted systematic and continuous business activities throughout California and otherwise intentionally availed itself of the market in California through the promotion, marketing and sale of its products, including AD&D Insurance.

26.     Venue lies within this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.

## **DEFENDANT'S VIOLATIONS OF CALIFORNIA LAW**

### **A.    Affinion's Undisclosed Marketing Arrangements and 60% Commission**

27.     Defendant preyed on California consumers' fears and took advantage of their naiveté and trust in their financial institutions to induce them to purchase the Affinion sponsored group AD&D Insurance by omitting material information that a reasonable consumer would have wanted to know before purchasing the Affinion sponsored group AD&D Insurance.

28.     Affinion is a marketing company whose business is to increase customer loyalty and earn incremental revenue for its clients.[6]

29.     Affinion created and continues to utilize this marketing apparatus to extract maximum premiums for group AD&D Insurance from unsuspecting California consumers to enrich itself, its insurance marketing partners and its financial institution clients at the expense of Plaintiffs and the putative Class.

30.     Affinion acts as a middleman. It is neither an insurance company nor a traditional insurance broker. It is a marketing company plain and simple. The financial institutions that promote the Affinion sponsored AD&D Insurance are Affinion's true clients.

31.     Affinion enters into agreements with financial institutions to acquire rights to their customer lists so Affinion can market its AD&D Insurance products to the financial institutions'

---

[6] Affinion Group Holdings, Inc. Form 10-K for the fiscal year ended December 31, 2017 ("Affinion 2017 Form 10-K") at 3-4, 8-10, available at https://www.sec.gov/Archives/edgar/data/1404624/000156459018004158/aghi-10k_20171231.htm. *See also* https://franklin-madison.com/capabilities/.

customers, purportedly as a value-added service to promote their customers' continuing business loyalty. Pursuant to these agreements, Affinion pays "administrative fees" to its financial institution clients either as a fee per insured or as a percentage of revenue. *See* Affinion 2017 Form 10-K at 9-10, F-10-F-12.

32.    With the customer data, Affinion identifies and targets consumers to whom it can market the group AD&D Insurance provided by its insurance company partners. These retail arrangements with banks and credit unions allow Affinion to leverage the financial institutions' "brand names" and customer data to market its group AD&D Insurance. *Id*. at 9.

33.    Affinion has special long-term relationships with a limited number of insurers that underwrite the group AD&D Insurance and authorize Affinion to act as the group plan administrator and agent on behalf of those companies. Affinion's insurance carriers include (or have included) Transamerica Premier Life Insurance Company, Minnesota Life Insurance Company, Federal Insurance Company (a member insurer of the Chubb Group of Insurance Companies), Mutual of Omaha and The Hartford, Inc. *Id*. at 10.

34.    Affinion's loyalty belongs primarily to itself and secondarily to its clientele - the financial institutions - but not to its group AD&D Insurance customers. In its recent announcement of its new name, Franklin Madison, made this clear stating that "Franklin Madison is focused on continuing to deliver on its commitments to its bank and credit union clients." *Affinion Insurance Solutions Announces New Company Name: Franklin Madison*, November 6, 2018, available at https://www.nafcu.org/newsroom/affinion-insurance-solutions-announces-new-company-name-franklin-madison.

35.    Affinion markets the AD&D Insurance directly to its financial institution clients' end-customers (Plaintiffs and Class members) to purportedly enhance its clients' relationships with those customers. Affinion 2017 Form 10-K at 4.

36.    The financial institutions who sell their customer lists to Affinion profit from this arrangement, receiving payment from Affinion for access to their customers either in the form a fee for each of its customers that purchase the AD&D Insurance or as a percentage of the marketing revenue Affinion takes from the premiums customers pay. *Id*. at F-12. As for Affinion,

apart from the approximate 60% commission, Affinion earns additional revenue from "economic sharing arrangements" or "profit shares" it has with the insurance companies that underwrite the policies it sells. *Id*. at 9, 35.

37.    Selling group insurance by contracting with financial institutions allows Affinion and its affiliated insurance companies to enroll large numbers of individual consumers rapidly into group plans at very little expense. This scheme results in higher premiums to Plaintiffs and other similarly situated consumers.

38.    Marketing AD&D Insurance has been a profitable business. Affinion's parent company sold Affinion to Mill Point Capital, a private equity firm for approximately $550,000,000 on August 15, 2018.[7]

39.    As of December 31, 2017, Affinion had 3,160 financial institutional clients and sold insurance, including the AD&D Insurance, to approximately 18.4 million customers. Affinion 2017 Form 10-K at 10. That number has only increased since. *See https://franklin-madison.com/who-we-are/.*

40.    Affinion earns significant revenue in the form of commissions from the premiums collected, as well as from the economic sharing arrangements with its affiliated insurance companies. Affinion 2017 Form 10-K at 35.

41.    Affinion reported $229.3 million in net revenues from its insurance business for 2017. *Affinion's commission revenue is reported net of insurance cost. Id*. at 44-46, F-11.

42.    Per its own calculations in its 2017 annual filings with the Securities and Exchange Commission — Affinion recognized an annual net revenue per insured of $71.34 — exclusive of the actual cost of insurance from each insured. *Id*. at 41.

43.    While the terms of the economic sharing arrangements with its insurance partners can require Affinion to refund fees when claims against an insurer exceed premiums, as of the end of 2017, Affinion has never made a payment to an insurer pursuant to these provisions. *Id*. at 9.

---

[7] The Membership Interest Purchase Agreement is available at https://www.sec.gov/Archives/edgar/data/1404624/000156459018017533/aghi-ex21_192.htm.

### B.    Affinion Induced Consumers to Purchase AD&D Insurance it Sponsored by Withholding Material Pricing Information

44.    The group rates for the AD&D Insurance Affinion peddled included a significant, undisclosed mark-up that was not related to the insurers' costs of providing insurance and significantly increased costs to Plaintiffs and the Class. It is more expensive than comparable group AD&D Insurance that Affinion did not sponsor.

45.    The Affinion sponsored AD&D Insurance carries a hefty price because Affinion receives approximately 60% of the premiums Plaintiffs and the Class paid in the form of undisclosed commissions.

46.    Affinion also retains the remaining 40% of the premium in an account it manages on behalf of its affiliated insurance companies. While this amount is distributed monthly to the insurance carrier to pay claims, administrative expenses, and the carrier's retention fee, Affinion receives any residual amounts left in that account after claims, administrative costs, and the insurance carrier's retention fee are paid out. *Id*. at F-11.

47. Affinion has no incentive to reduce the amount of premium paid by the insureds who are the customers of its financial institution clients. In fact, Affinion has every incentive to maximize the premium amounts. The higher the premium, the more money Affinion, its financial institution clients, and its supplier partner insurance companies make.

48.    Defendant's marketing scheme follows a standard procedure and uses form documents that do not vary. Affinion also uses a sophisticated, proprietary data analytics platform to market the AD&D Insurance.[8]

49.    The Affinion marketing campaign uniformly begins with standard solicitation letters that provide some information regarding the group AD&D Insurance being offered, but omit material details regarding pricing and Affinion's relationship with consumers' financial institutions.  Upon information and belief, this practice continues to this day.

---

[8] *Mill Point Capital Announces Carve-Out of Affinion Insurance Solutions*, July 5, 2018, available at https://www.businesswire.com/news/home/20180705005316/en/Mill-Point-Capital-Announces-Carve-Out-Affinion-Insurance.

50.     Affinion sent its standard solicitations to Plaintiffs and others on their financial institutions' letterhead notifying them of free AD&D Insurance paid for by their bank or credit union.

51.     To illustrate: In 2013, Plaintiff Rodriguez received a solicitation from Affinion to purchase AD&D Insurance on the letterhead of his credit union, the San Diego County Credit Union ("SDCCU"). The solicitation offered $3,000 of "free" AD&D Insurance paid by SDCCU and offered Plaintiff Rodriguez the option of purchasing up to $300,000 of additional coverage from The Hartford at the "affordable group" rate of $1.00 per month per $10,000 worth of coverage or "about 3 cents a day." *See* 2013 Letter Solicitation to John Rodriguez from Patrick Cosgrove, Executive Vice President, San Diego County Credit Union, and Doug Smith, Authorized Agent of the Hartford and Plan Administrator ("Solicitation Letter"), attached as Exhibit A.

52.     At the time the letter was sent, Doug Smith was the Senior Vice President of Sales at Affinion. The Solicitation Letter did not disclose that Doug Smith was actually employed by Affinion at the time it was sent.

53.     In the Solicitation Letter, Affinion notified Plaintiff Rodriguez (and other consumers) that they were entitled to $3,000 in free "credit-union paid coverage" for AD&D Insurance that they needed to activate by simply signing and returning an enclosed "activation form" using a postage-paid envelope, and further urged Plaintiff (and other consumers) to purchase additional group AD&D Insurance beyond the "no-cost $3000 of protection." *Id.*

54.     The Solicitation Letter urged Plaintiff and all targets of Affinion's campaign to purchase additional AD&D Insurance because "[n]o one can predict what the future will bring. One thing is for sure --- accidents can happen. And if an accident happens to you, this coverage and any additional protection you select could mean greater security for your family at a time they may need it most" and promised 24/7 protection. *Id.*

55.     After frightening its targeted consumers, the Solicitation Letter touts the benefits and affordability of the Affinion sponsored AD&D Insurance and offers the recipient the

opportunity to purchase (with guaranteed acceptance) up to $300,000 of additional AD&D Insurance at "affordable group rates," of $1.00 per month per $10,000 in coverage. *Id.*

56.    The Solicitation Letter specifically promises "guaranteed acceptance" with no required medical exam as if this is a uniquely valuable, additional benefit. It is not. This kind of group insurance does not require individual policyholder underwriting by its very nature. That Affinion offers its AD&D Insurance without a medical exam is not an upgrade, nor does it make the insurance a superior product. *Id*.

57.    A bank or credit union officer of the sponsoring financial institution and the authorized agent of the sponsoring insurance company (who is also the Plan Administrator of the group policy) co-signed the Solicitation Letter. *Id.*

58.    The Solicitation Letter separately enclosed a brochure that purports to provide more information about the coverage terms of the AD&D Insurance offered, including specifically a Rate Schedule that specifies the monthly cost at pre-defined benefit amounts of the supposedly "affordable" group coverage that will be automatically charged quarterly (once selected) to the consumer's account with the sponsoring financial institution.

59.    In or around July 2013, Plaintiff Rodriguez activated his free $3,000 of AD&D Insurance and purchased an additional $100,000 of AD&D Insurance which, at the Solicitation Letter's promised group rate of $1.00 a month per $10,000 of coverage, equaled an actual monthly charge to Plaintiff of $10.00 per month. His credit union and Defendant arranged for his total quarterly premium of $30.00 (3 x $10.00) to be automatically debited from his SDCCU account. *See* July 15, 2013 Letter to John M. Rodriguez from The Hartford, signed by Doug Smith, Licensed Insurance Agent ("Confirmation Letter"), attached as Exhibit B.

60.    The Confirmation Letter enclosed his individual Certificate of Insurance, which denoted Plaintiff Rodriguez as an insured person eligible for coverage under the group policy plan provided by Hartford Life and Accident Insurance Company to the policyholder. The Certificate listed his credit union, San Diego County Credit Union, as the policyholder and identified the Policy Number as AD&D-12208. *See* Hartford Certificate of Insurance, Coverage ID 752421897, under Policy Number ADD-12208, attached as Exhibit C.

61.     Plaintiff Rodriguez subsequently received another letter on September 18, 2013 confirming that he had been enrolled for a total amount of $100,000 in Voluntary (*i.e.*, "Contributory") paid AD&D Insurance, which amount did not include the no-cost $3000 of Basic (*i.e.*, "Non-Contributory") coverage paid for him by SDCCU. The letter offered Plaintiff Rodriguez an opportunity to increase his coverage. *See* September 18, 2013 Letter to John M. Rodriguez from Affinion Group, signed by Doug Smith, Licensed Insurance Agent, attached as Exhibit D.

62.     Plaintiff Rodriguez increased his coverage to $150,000. His new premium totaled $45.00 every quarter, which Affinion automatically debited from his credit union account.

63.     On September 30, 2013, Mr. Rodriguez received a letter from The Hartford enclosing his new coverage documents for a total of $153,000 in AD&D coverage from The Hartford.  It enclosed his new Certificate of Insurance with his credit union again listed as the policyholder, under Policy Number: AD&D-12208.  *See* September 30, 2018 Letter to John M. Rodriguez from The Hartford, signed by Doug Smith, Licensed Insurance Agent, along with Hartford Certificate of Insurance, Coverage ID 752421897, under Policy Number ADD-12208, attached as Exhibit E.

64.     At some time between September 2013 and November 2014, Monumental Life Insurance Company, another Affinion insurance underwriter that was a Transamerica company, began to provide Plaintiff Rodriguez's AD&D coverage under the same terms as his Hartford issued Certificate of Insurance under Coverage ID 752421897. *See* November 20, 2014 Letter to John M. Rodriguez from Monumental Life Insurance Company, attached as Exhibit F.

65.     Mr. Rodriguez's amount of additional group AD&D Insurance, monthly premium rate and method of payment all remained the same. *See id.*

66.     On November 20, 2014, Mr. Rodriguez received a letter from Monumental notifying him that Monumental Life Insurance Company had changed its name to Transamerica Premier Life Insurance Company. *Id.* The letter also assured Mr. Rodriguez that the name change would have no effect on his benefits or method of payment.  *Id.*

67.     Mr. Rodriguez continued to make payments for his AD&D Insurance until approximately June 2017 when he stopped banking at SDCCU, and Affinion could no longer deduct the premiums automatically from his account.

68.     Plaintiff Quezada was similarly harmed by Affinion's false and deceptive practices in violation of California law.

69.     In or around 2014, Plaintiff Quezada received substantially similar solicitations to those Plaintiff Rodriguez received but from Citibank where Plaintiff Quezada had an account.

70.     The solicitation Plaintiff Quezada received touted affordable AD&D coverage, offering a base amount of coverage of no more than a few thousand dollars for "free" with add-on coverage above the base amount available for additional cost. As with the solicitations received by Plaintiff Rodriguez, the Affinion marketing materials sent to Plaintiff Quezada did not disclose material details regarding pricing and Affinion's relationship with consumers' financial institutions.

71.     Her certificate of insurance under her group policy was originally underwritten through Transamerica but was transferred in 2018 to Minnesota Life in March 2018.

72.     The group policyholder of her policy is the "Financial Services Association." The Financial Services Association is not affiliated with Citibank, Plaintiff Quezada's financial service provider. Nor is the Financial Services Association a true group with the best interests of its members as its priority. Instead, unbeknownst to Plaintiff Quezada and other Class Members, the Financial Services Association is a group assembled by Affinion consisting of accountholders at various financial institutions that partner with Affinion and for which Affinion markets products. Indeed, the Financial Services Association was created by Affinion as a vehicle to offer group insurance policies, including the AD&D policies.

73.     Affinion controls the Financial Services Association and, at times, all but one board member of the Financial Services Association was an Affinion employee. Affinion does not disclose its relationship with the Financial Services Association to consumers to which it markets its insurance policies.

74.    Plaintiff Quezada paid $99.00 quarterly for $200,000 worth of coverage. Her last payment was made in June 2019.

**C.    Defendant's Omissions and Half-Truths**

75.    Through a combination of half-truths and non-disclosures, Defendant misled Plaintiffs and the Class into incorrectly believing that the sponsoring financial institutions had negotiated a favorable rate for the group AD&D Insurance offered to accountholders.

76.    Employers or other organizations, such as affinity groups (whose individual members share a common goal, purpose or interest), typically offer insurance to their members at discounted rates (compared to rates available to non-members) as a benefit, because their large membership numbers are an attractive business opportunity for insurers to profit even when offering lower than usual rates because of the reduced risk and administrative cost to the insurer from having a comparatively large pool of insureds.

77.    Such groups typically leverage their collective buying power to obtain advantageous pricing by shopping around or obtaining competitive bids to ensure the best insurance policy possible (meaning, a policy offering the broadest coverage available at the lowest premium).

78.    Defendant, however, created "groups" with names like the "Financial Services Association" that appear to be *bona fide* consumer-oriented affinity groups but, in reality, are nothing more than a marketing platform to sell Affinion's products to Plaintiffs and the Class.

79.    In this manner, Defendant's uniform solicitations suggested to Plaintiffs and other Class members they would be paying lower rates than were otherwise available. In particular, the solicitations expressly stated that, as accountholders, Plaintiffs and other Class members were exclusively being offered "free" AD&D Insurance with additional coverage at "affordable" group rates of about "three cents a day" for as much as $10,000 worth of "important" accident protection.

80.    For example, while the brochure that Affinion enclosed with its Solicitation Letter to Plaintiff Rodriguez expressly recites (in fine print only) that (1) Affinion "is compensated for the placement of insurance and for the benefits it provides to customers on behalf of the insurance

company, in addition to other compensation it may receive," and further, that (2) "Compensation associated with this insurance program may be paid to sponsoring entities," neither the Solicitation Letter nor the brochure discloses that (1) The Hartford (as well as Monumental Insurance Company and Transamerica Premier Life) agreed to pay Affinion from premiums Plaintiffs and class members paid to the tune of approximately 60% of the premium, (2) this 60% surcharge amount (from which Affinion would pay the financial institutions a client fee) was far in excess of the reasonable cost of providing the group AD&D Insurance, and (3) the accountholder could avoid paying this added 60% expense by independently obtaining the same type of insurance coverage elsewhere.

81.    Although Defendant's solicitations touted "affordable group rates" (*see* Exhibit A), consumers did not receive a favorable group rate. In fact, the Affinion sponsored group AD&D Insurance cost Plaintiffs and consumers substantially more than comparable group AD&D Insurance that Affinion did not sponsor.

82.    For example, the Affinion sponsored policy that Plaintiff Rodriguez paid for cost $1.00 per month for $10,000 in coverage, whereas the rate for a Hartford AD&D policy for members of the National Association of Social Workers is $0.42 per month for $10,000 in coverage (based on $50,000 in coverage at $.07 per day). Attached as Exhibit G.

83.    Similarly, Transamerica Premier Life Insurances' Tennessee rate filing provides illustrative rates of $0.40 per month for $10,000 in coverage for association members. *See* Transamerica Premier Life Insurance Company, Gross Premium Rates, attached as Exhibit H. In its accompanying explanatory memo, Transamerica's actuary states that the "expected average annual premium for this product is $1.68." *See* Transamerica Premier Life Insurance Company Actuarial Memorandum, attached as Exhibit I.

84.    Plaintiffs did not know Affinion and its partnering insurers had devised and implemented a marketing scheme to strictly benefit Affinion's client financial institutions (and themselves) by allowing them to merely offer insurance on a group basis to encourage their customers' continuing loyalty, but had no reason to provide a lower, competitive rate in doing so.

85.    Defendant's standard solicitation employs language that is designed to mislead Plaintiffs and others by omitting this key information to obfuscate the payment relationship and actual amounts being paid among Affinion, its partner insurers, and client financial institutions, and the real reason why Affinion, its insurer marketing partners and its client financial institutions were promoting this expensive AD&D Insurance.

**D.    Plaintiffs Relied on Defendant's Half-Truths and Omissions**

86.    Plaintiffs believed their financial institutions were offering the Affinion sponsored insurance at advantageous group rates.

87.    Plaintiffs believed that their financial institutions had acted in their best interests by offering a beneficial product and had negotiated favorable group AD&D Insurance rates. They did not know that the rates they paid were not favorable but were more expensive than the rates for comparable group AD&D Insurance that Affinion did not sponsor and market through financial institutions.

88.    Plaintiffs did not know that Affinion collected approximately 60% of premiums he paid for the Affinion sponsored group AD&D Insurance.

89.    Plaintiffs did not know that their financial institutions were Affinion's clients.

90.    Had Defendant disclosed the truth about these material facts, Plaintiffs would not have purchased the Affinion sponsored AD&D Insurance.

## CLASS ALLEGATIONS

91.    Plaintiffs brings this action, on behalf of themselves and the Class, as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

92.    Plaintiffs define the Class as follows:

> All California residents who received a Certificate of Insurance for at least one AD&D group insurance policy obtained through Affinion and one of its partner insurers, and made at least one premium payment on that policy.

93.    Excluded from the Class are insureds that were paid benefits by the insurer for a loss submitted in connection with AD&D Insurance obtained through Affinion and one of its partner insurers.

94.     Excluded from the Class are Defendant and any and all of its affiliates, legal representatives, heirs, successors, employees or assignees.

95.     The following individuals are also excluded from the Class: (1) persons who properly execute and file a timely request for exclusion from the Class; (2) the legal representatives, successors or assigns of any such excluded persons; and (3) persons whose claims against Defendant have been fully and finally adjudicated and/or released.

96.     The action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

**A.     Numerosity**

97.     The members of the Class are so numerous that joinder of all members in one action is impracticable. While the precise number, names and addresses of all Class members are unknown to Plaintiffs at this time, such information can be ascertained from records maintained by Defendant. The Class is reasonably estimated to be at least in the thousands (and likely much higher). Affinion Group Holdings, Inc. reports that it had approximately 43 million subscribers and end-customers enrolled in its programs. Affinion 2017 Form 10-K at 4. Affinion Insurance Solutions (now Franklin Madison) provided guaranteed-issue insurance products to over 18 million insureds. Affinion 2017 Form 10-K at 3.

**B.     Commonality**

98.     The claims of Plaintiffs and the Class have a common origin and share a common basis. All Class members suffered from the same misconduct described herein, and they all suffered the same injury and lost money or property because of Defendant's violations of the California UCL supported by common proof. Common questions of law exist as to all members of the Class. These questions include, but are not limited to the following:

a.      Whether Defendant's AD&D Insurance included undisclosed mark-ups;

b.      Whether Defendant had a duty to disclose that Plaintiffs' and the Class' premiums included substantial payments to Affinion as part of the undisclosed mark-ups;

c.      Whether Defendant had a duty to disclose to Plaintiffs and the Class that their financial institutions were Affinion's clients, and further, that the object of Affinion's

marketing services to its clientele was to build customer loyalty by allowing the financial institutions to simply offer group insurance as an added benefit to their customers (though not at competitively discounted group rates);

d.      Whether Defendant had a duty to disclose that the *quid pro quo* for the insurers' agreement to pay Affinion approximately 60% of the premium due, and Affinion's agreement to in turn pay the financial institutions, was because of the commercial value to each of those sponsoring entities of access to the financial institutions' customer contact information to sell AD&D Insurance on a group basis;

e.      Whether Defendant's claim that the AD&D Insurance rate was an "affordable group rate" was a misleading half-truth;

f.      Whether Defendant's conduct constituted fraudulent or unfair business practices under California Business and Professions Code, §§ 17200 et seq.;

g.      Whether Plaintiffs and the Class lost money or property due to Defendant's fraudulent and unfair business practices;

h.      Whether Plaintiffs and the Class are entitled to restitution; and

i.      Whether the Court can enter prospective declaratory and injunctive relief.

**C.      Typicality**

99.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were harmed in the same way by Defendant's wrongful conduct. Every member of the Class was harmed by paying for AD&D Insurance at rates that included undisclosed mark ups.

**D.      Adequacy**

100.    Plaintiffs and every Class member suffered the same harm and were victims of the same fraudulent and unfair practices and Plaintiffs seeks to hold Defendant accountable for the wrongs it has committed and to make the Class whole. Plaintiffs are committed to fairly, adequately and vigorously represent and protect the interests of the Class. Plaintiffs have retained counsel who are qualified and experienced in class action litigation of this kind. Neither Plaintiffs

nor their counsel have any interests that might cause them to refrain from vigorously pursuing the claims in this class action. In addition, Defendant has no defenses unique to Plaintiffs.

**E.    Predominance and Superiority**

101.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the UCL. Common questions of law and fact predominate over questions affecting only individual Class members.

102.    A class action is superior to all other alternatives for the resolution of this matter, especially given that joinder of all parties is impracticable.

103.    The damages suffered by many individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of this complex litigation.

104.    It would be virtually impossible for individual Class members to obtain effective relief from Defendant's actions absent certification of a class action.

105.    Individual litigation of multiple cases would be highly inefficient, a waste of judicial and party resources and the prosecution of separate actions by individual members of the Class would create a risk of inconsistent results.

106.    Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution.

107.    Plaintiffs are not aware of any difficulties regarding the management of this litigation which would preclude its maintenance as a class action.

108.    In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

# CLAIMS FOR RELIEF

## COUNT ONE

### Violation of California's Unfair Competition Law California Business &Professions Code §§ 17200 et seq.

### Fraudulent Business Practices

109.    Plaintiffs repeat and reallege every allegation contained above as if fully set forth herein.

110.    Cal. Bus. & Prof. Code § 17200 et seq. prohibits any unlawful, unfair or fraudulent business act or practice.

111.    Defendant's acts and practices, as alleged herein, are fraudulent business acts and practices under the UCL.

112.    Defendant's conduct is fraudulent because Defendant made false and misleading statements to California consumers omitting material information that a reasonable consumer would want to know before purchasing its group AD&D Insurance.

113.    Defendant's acts and practices are fraudulent because Defendant had knowledge of material information that was not known to Plaintiffs and the Class and because Defendant deceived Plaintiffs and the Class by making partial representations that suppressed material facts.

114.    Defendant's acts and practices constitute fraudulent omissions because Defendant, having provided partial information, had a duty to further disclose the whole truth. Defendant, having made representations regarding the affordability of the Affinion sponsored AD&D Insurance and its attractive group rates had a duty to disclose all material facts within their knowledge regarding the Affinion sponsored AD&D Insurance that Plaintiffs and other California consumers could not ascertain independently.

115.    Defendant's acts and practices constitute fraudulent omissions because their marketing materials included omissions of facts Defendant was obliged to disclose relating to their contractual and business relationships.

116.    Defendant's acts and practices constitute fraudulent omissions because Defendant has exclusive knowledge of material facts not known or reasonably accessible to the Plaintiffs and the Class.

117.    Defendant's acts and practices are fraudulent because they induced Plaintiffs and members of the Class to purchase group AD&D Insurance by sending misleading Solicitation Letters with brochures to Plaintiffs and every Class member that omitted material pricing information regarding the Affinion sponsored group AD&D Insurance and the business relationships between the Defendant, its partner insurers, and Plaintiff's and Class members' financial institutions that a reasonable individual would want to know before purchasing group AD&D Insurance.

118.    Defendant's acts and practices are likely to deceive the public.

119.    A reasonable consumer would be deceived by Defendant's statements and omissions in the sale of Affinion sponsored group AD&D Insurance, and Plaintiffs and members of the Class have in fact been deceived and would have behaved differently had they known the whole truth.

120.    Had Plaintiffs and the Class known the whole truth, they would not have purchased the Affinion sponsored group AD&D Insurance.

121.    Plaintiffs and the Class were injured in their money or property because Defendant's fraudulent acts and practices violate the UCL.

122.    The foregoing acts and practices have detrimentally impacted competition and have cause substantial harm to Plaintiffs and the Class.

123.    Plaintiffs and the Class are entitled to, and seek, restitution of their money or property that Defendant acquired by means of their unfair competition.

## COUNT TWO

### Violation of California's Unfair Competition Law California Business &Professions Code §§ 17200 et seq.

### Unfair Business Practices

124.    Plaintiffs repeat and reallege every allegation contained above as if fully set for the herein.

125.    Cal. Bus. & Prof. Code § 17200 et seq. prohibits any unlawful, unfair or fraudulent business act or practice.

126.    Defendant's acts and practices, as alleged herein, are unfair business acts and practices under the UCL.

127.    Defendant's practices as alleged herein are unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive and/or unscrupulous. The gravity of Defendant's conduct outweighs any benefit of such conduct.

128.    Defendant's misleading statements that omit material information are unfair business acts and practices under the UCL.

129.    Defendant's acts and practices are unfair because they induced Plaintiffs and members of the Class to purchase AD&D Insurance by sending misleading Solicitation Letters and brochures to Plaintiffs and every Class member that omitted material pricing information regarding the Affinion sponsored AD&D Insurance and the business relationships between the Defendant, its partner insurers, and Plaintiff's and Class members' financial institutions that a reasonable individual would want to know before purchasing AD&D Insurance.

130.    A reasonable consumer would be deceived by Defendant's statements and omissions in the sale of Affinion sponsored AD&D Insurance, and Plaintiffs and members of the Class have in fact been deceived and would have behaved differently had they known the whole truth.

131.    Had Plaintiffs and the Class known the whole truth -- including that approximately 60% of their premiums were paid to Affinion for marketing services, and that their financial institutions were Affinion's clients and were paid to provide their contact information to Affinion

1  so Affinion could market its AD&D Insurance and that the rates they paid were not lower group

2  rates -- they would not have purchased the Affinion sponsored AD&D Insurance.

3      132.    As a result of Defendant's unfair acts and practices that violate the UCL, Plaintiffs

4  and the Class were injured in their money or property.

5      133.    The foregoing acts and practices have detrimentally impacted competition and

6  have cause substantial harm to Plaintiffs and the Class.

7      134.    Plaintiffs and the Class are entitled to and seek restitution of their money or

8  property that Defendant acquired by means of their unfair competition.

9                        **PRAYER FOR RELIEF**

10      Plaintiffs, on behalf of themselves and all others similarly situated, requests the Court to

11  enter judgment on their behalf and on behalf of the Class as follows:

12      1.    Certifying the Class, as requested herein, appointing Plaintiffs as the Class

13  Representatives, and appointing Plaintiffs' counsel as counsel for the Class;

14      2.    Issuing appropriate notice to the Class at Defendant's expense;

15      3.    Awarding restitution of Defendant's revenues or profits from its illegal behavior

16  described herein to Plaintiffs and members of the Class;

17      4.    Awarding prospective declaratory and injunctive relief as permitted by law or

18  equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein,

19  and directing Defendant to identify, with Court supervision, victims of its conduct and restore to

20  them all monies acquired by Defendant by means of any act or practice declared by this Court to

21  be wrongful and to change their business practices.

22      5.    Awarding interest on the monies wrongfully obtained from the date of collection

23  through the date of entry of judgment in this action;

24      6.    Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in

25  connection with the commencement and prosecution of this action; and

26      7.    For such other and further relief as the Court deems just and proper.

27                        **JURY DEMAND**

28  Plaintiffs demand a trial by jury on all claims triable as a matter of right.

| | |
|---|---|
| 1 | Dated: November 8, 2019 |

Respectfully submitted,

/s Benjamin Galdston
Benjamin Galdston (CA Bar No. 211114)
**BERGER MONTAGUE PC**
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Tel: (619) 489-0300
bgaldston@bm.net

**TYCKO & ZAVAREEI LLP**
Annick Persinger (SBN 272996)
1970 Broadway – Suite 1070
Oakland, CA 94612
Tel: (510) 254-6808
Fax: (202) 973-0950
apersinger@tzlegal.com

Peter R. Kahana*
Amanda Trask*
Y. Michael Twersky*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Tel.:  (215) 875-3000
Fax:  (215) 875-4604
pkahana@bm.net
atrask@bm.net
mitwersky@bm.net

**BERGER MONTAGUE PC**
John G. Albanese*
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Tel: (612) 594-5997
Fax: (612) 584-4470
jalbanese@bm.net

**TYCKO & ZAVAREEI LLP**
Andrea R. Gold*
1828 L Street, NW - Suite 1000
Washington, DC 20036
Tel: (202) 973-0900
Fax: (202) 973-0950
agold@tzlegal.com

*pro hac vice forthcoming

24